


FILED

Nov 20 2024, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Kiandre Dominick Owens,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

November 20, 2024

Court of Appeals Case No.
24A-CR-900

Appeal from the Monroe Circuit Court

The Honorable Darcie L. Fawcett, Judge

Trial Court Cause No.
53C09-2008-F1-737

---

**Opinion by Judge Tavitas**
Judges May and DeBoer concur.

**Tavitas, Judge.**

## Case Summary

Kiandre Owens appeals his conviction for attempted murder, a Level 1 felony. Owens argues: (1) the trial court erred by admitting DNA evidence obtained from swabs taken from Owens' hands and clothing because Owens was not advised of his *Pirtle*[1] rights before law enforcement collected these swabs; and (2) insufficient evidence supports Owens' conviction. We disagree with these arguments and, accordingly, affirm.

## Issues

Owens raises two issues on appeal, which we restate as:

> I. Whether the trial court erred by admitting DNA evidence obtained from swabs taken from Owens' hands and clothing because Owens was not advised of his *Pirtle* rights before law enforcement collected these swabs.

> II. Whether sufficient evidence supports Owens' conviction.

## Facts

Owens and Nariah Blount became friends in the summer of 2020 after meeting through a mutual friend, Aleah Hamilton. Owens went by the name "Cali." Tr. Vol. II p. 9. On August 4, 2020, Owens was at Blount's house in

---

[1] *Pirtle v. State*, 323 N.E.2d 634 (Ind. 1975).

Bloomington and engaged in an argument about a gun with Blount's brother and others. Blount told Owens that he needed to leave, and she contacted Hamilton to pick up Owens from the house.

[4] The evening of August 5, 2020, Blount was home alone when Owens knocked on her front door. Blount could see that Owens was carrying a bottle of vodka. Owens apologized to Blount for the argument from the previous night, and Blount told him that he would need to apologize to her brother. Owens then asked to use the restroom.

[5] Before Owens left, he thanked Blount for allowing him to apologize and asked for a hug. As the two hugged, Blount saw Owens raise the vodka bottle and strike her across the face. Owens continued to strike Blount on the head at least thirteen times. At one point, Blount tried to get up and run, but she slipped in blood, and Owens began stabbing her with a two-to-three-inch pocket knife. Owens then put Blount in a headlock, dragged her across the living room, "looked over [her] and then slit [her] throat." *Id*. at 14.

[6] Blount "played dead," and Owens left the house. *Id*. at 15. After waiting to make sure Owens had gone, Blount left the house and lay in the road where she was discovered by neighbors and a passing vehicle. First responders arrived and transported her to the hospital. Blount told law enforcement officers at the hospital that "Cali" was her assailant. *Id*. at 16.

[7] Blount had lacerations to her head, ear, eyebrow, lip, neck, chest, and abdomen. Her colon was protruding through her skin. Fortunately, the

lacerations to her neck only penetrated the muscle and did not puncture major blood vessels or her airway. She required intensive surgery and was hospitalized for approximately seven days.

[8] After the attack, Owens checked himself into the same hospital where Blount had been admitted. Hospital staff informed law enforcement officers that Owens was at the hospital, had a cut on his hand, and "could possibly be the suspect" in Blount's attack. *Id*. at 48. Bloomington Police Department Detective Jeffrey Rodgers had an evidence technician take swabs of the blood on Owens' hands and clothing. Law enforcement later obtained a search warrant to take a buccal swab of Owens to compare to the swabs taken from Owens' hands and clothing. DNA testing results from the swabs taken from Owens' hands and clothing each individually provided "very strong support for the inclusion" of Blount's DNA. Ex. Vol. III pp. 42-47.

[9] After Owens was treated for his injuries, he was taken for a custodial interrogation, where he was advised of and waived his *Miranda*[2] rights. Owens stated that he believed Blount and her friends were "going after [his] family" and that he wanted to "kill everybody who got involved with it." State's Ex. 32 at 22:50, 40:00. He admitted that he went to Blount's house, struck her with a bottle, and stabbed her with a knife.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[10] Law enforcement conducted DNA testing on objects from the crime scene and obtained the following results: (1) blood on the exterior front doorknob provided "very strong support" for the inclusion of Owens; (2) blood on the interior front doorknob provided "moderate support" for the inclusion of Owens"; and (3) blood on the interior back doorknob provided "very strong support" for the inclusion of Owens. Ex. Vol. II pp. 42-43.

[11] On August 7, 2020, the State charged Owens with attempted murder, a Level 1 felony. A bench trial took place on February 27, 2024. Blount testified regarding her relationship with Owens and Owens' attack upon her. She identified Owens in court as her assailant.

[12] Detective Rodgers testified regarding the swabs taken from Owens' hands and clothing at the hospital. Detective Rodgers initially testified, upon questioning by defense counsel, that he did not "ask [Owens] for consent to search" nor give Owens a *Pirtle* advisement prior to obtaining the swabs. Tr. Vol. II p. 53. On subsequent questioning, Detective Rodgers testified that he "did ask [Owens] for a swab," although he did not mention whether Owens consented to the collection of the swabs. *Id.* at 56.

[13] The State sought to admit DNA testing results from the swabs of Owens hands and clothing; however, Owens objected on the grounds that he was not advised of his *Pirtle* rights prior to law enforcement's collection of the swabs. The trial court overruled Owens' objection and admitted the DNA results. The trial

court also admitted Owens' statements from the custodial interview. The trial court found Owens guilty as charged. Owens now appeals.

## Discussion and Decision

### I. *Pirtle* advisements were not required for the swabs of Owens' hands and clothing at the hospital, and the trial court did not err by admitting the DNA evidence obtained therefrom.

Owens first argues that, because he was not advised of his *Pirtle* rights prior to the collection of the swabs of his hands and clothing at the hospital, the trial court erred by admitting the DNA results obtained from these swabs. We disagree.

We review the trial court's ruling on the admissibility of evidence for an abuse of the trial court's discretion. *McCoy v. State*, 193 N.E.3d 387, 390 (Ind. 2022). "But when, like here, the trial court's determination involves the constitutionality of a search or seizure, that determination is a question of law to which a de novo standard of review applies." *Id*.

As our Supreme Court has explained,

> The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects" from unreasonable searches and seizures. U.S. Const. amend. IV. It requires police to obtain a search warrant from a neutral, detached magistrate prior to undertaking a search of either a person or private property. . . .
>
> Our State Constitution offers citizens parallel protections against unreasonable searches and seizures. For instance, Article 1,

> Section 11 provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated."

*M.D. v. State*, 108 N.E.3d 301, 304 (Ind. 2018).

[17] Under the Fourth Amendment, a person's valid consent to a search generally eliminates the need for a search warrant. *M.D.*, 108 N.E.3d at 304. In *Pirtle v. State*, however, our Supreme Court held that Article 1, Section 11 of the Indiana Constitution offers "broader protections" for individuals consenting to a search. *Id.* at 304; *Pirtle*, 323 N.E.2d 634, 639-40 (Ind. 1975). Under *Pirtle*, a person in custody generally has the right to consult with counsel regarding whether to consent to a law enforcement search, and law enforcement "must explicitly advise a person in custody of [his or] her right to consult with counsel" prior to obtaining consent to search. *M.D.*, 108 N.E.3d at 304.

[18] *Pirtle* rights also draw from Article 1, Section 13 of the Indiana Constitution. The Court in *Pirtle* noted that the Sixth Amendment to the United States Constitution provides the right to counsel "at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial," and that Article 1, Section 13 of the Indiana Constitution similarly guarantees "a defendant the assistance of counsel for his defense." *Pirtle*, 323 N.E.2d at 639. The right to counsel under the Indiana Constitution attaches earlier than under the United States Constitution because the right to counsel under the Indiana Constitution

attaches "upon arrest, rather than only when formal proceedings have been initiated." *State v. Taylor*, 49 N.E.3d 1019, 1024 (Ind. 2016).

[19]     The principle behind *Pirtle* is to "protect people from the most serious intrusions into privacy." *Garcia-Torres v. State*, 949 N.E.2d 1229, 1238 (Ind. 2011). *Pirtle* itself involved the consensual search of a home, and in *Sellmer v. State*, 842 N.E.2d 358, 365 (Ind. 2006), our Supreme Court extended *Pirtle* to the consensual search of a vehicle. *Pirtle*, however, does not apply to "minimally intrusive searches." *M.D.*, 108 N.E.3d at 306. In determining whether *Pirtle* advisements are necessary before obtaining consent for a given search, our Supreme Court has explained:

> [W]e need not contemplate whether a person has a legitimate expectation of privacy, nor whether the State's intrusion was unreasonable. After all, those questions go to whether police must obtain a warrant—a question not at issue here. Moreover, a person may freely consent to even the most unreasonable of intrusions; where such consent is valid, no warrant is required. Rather, our concern in *Pirtle*, and in the ensuing cases, was that consent to certain weighty intrusions carries a great risk of involuntariness. This is especially true, as described by the Court of Appeals in *Ackerman* [*v. State*], 774 N.E.2d [970, 981 (Ind. Ct. App. 2022), *trans. denied*], for unlimited and general searches where police are given carte blanche to search for unspecified evidence. Searches of a home or a vehicle ordinarily require officers to specify what they are looking for and their reasons for believing that the suspect had those items in their home or in their vehicle. A person who consents to a search gives up those protections and subjects herself to a general search without probable cause. Because a person in custody may not fully appreciate the magnitude of what is at stake when authorizing police to freely search a home or a vehicle, we require police to

explicitly inform persons in custody of their rights under our Constitution. Those concerns are not as strong when a search is narrowly focused.

*M.D.*, 108 N.E.3d at 306 (emphasis added).

[20] Because not all searches require *Pirtle* advisements, our courts have declined to apply *Pirtle* to certain types of searches. *See M.D.*, 108 N.E.3d at 307 (*Pirtle* inapplicable to drug recognition exams); *Garcia-Torres*, 949 N.E.2d at 1239 (*Pirtle* inapplicable to buccal swabs); *Wilkerson v. State*, 933 N.E.2d 891, 894 (Ind. Ct. App. 2010) (*Pirtle* inapplicable to pat down search for weapons); *Datzek v. State,* 838 N.E.2d 1149, 1158-60 (Ind. Ct. App. 2006) (*Pirtle* inapplicable to chemical blood testing for blood alcohol content), *trans. denied*; *Schmidt v. State,* 816 N.E.2d 925, 942-44 (Ind. Ct. App. 2005) (*Pirtle* inapplicable to chemical breath tests), *trans. denied*; *Ackerman,* 774 N.E.2d 979-82 (*Pirtle* inapplicable to field sobriety tests); *but see Posso v. State*, 180 N.E.3d 326, 336 (Ind. Ct. App. 2021) (applying *Pirtle* to search of cellphone).

[21] Here, Owens does not argue that the collection of the swabs violated his Fourth Amendment rights.[3] Rather, Owens argues that, because he was not advised of

---

[3] The State argued at trial that the collection of the swabs without a warrant did not violate Owens' Fourth Amendment rights because Owens' treatment at the hospital could have destroyed the evidence; exigent circumstances, thus, justified the search. Under the exigent circumstances doctrine, a search warrant is not required "when exigent circumstances make law enforcement needs so compelling that a warrantless search or seizure is objectively reasonable." *Ramirez v. State*, 174 N.E.3d 181, 190 (Ind. 2021); *see Holder v. State*, 847 N.E.2d 930, 938 (Ind. 2006) ("Possible imminent destruction of evidence is one exigent circumstance that may justify a warrantless entry into a home if the fear on the part of the police that the evidence was immediately about to be destroyed is objectively reasonable."). Owens makes no argument that exigent circumstances did not exist here.

his right to counsel prior to law enforcement's collection of the swabs, the collection of the swabs constitutes a search in violation of his *Pirtle* rights under the Indiana Constitution. *Pirtle* advisements are only necessary when the defendant consents to a search while in custody, and it is not clear from the record whether both of those circumstances coexist here.[4] Even if we assume that Owens was in custody and consented to the collection of the swabs, however, we hold that the collection of the swabs here was not the type of search that triggers *Pirtle* protections.

[22] We find *Garcia-Torres*, 949 N.E.2d 1229, instructive. In that case, upon his arrest, the defendant consented to a buccal swab without the advisement of his *Pirtle* rights. *Id*. at 1231. Our Supreme Court held that the collection of the buccal swab was not a search for which *Pirtle* advisements were required. *Id*. at 1238-39. The Court noted that the intrusion was "slight"; the swabbing "caused no discomfort," and the defendant had "virtually no legitimate interest in concealing his identity following his lawful arrest." *Id*. at 1239. The Court analogized buccal swabs to "fingerprints and other identifying physical

---

[4] The determination of whether a person is in custody is an "objective test" in which we ask whether "reasonable persons under the same circumstances would believe they were in custody or free to leave." *Campos v. State*, 885 N.E.2d 590, 601 (Ind. 2008). Here, several officers appear to have been present during the collection of the swabs and, after Owens was treated, he was taken for a custodial interview. Under these circumstances, we conclude that Owens was in custody. Even if Owens was in custody, however, *Pirtle* is only applicable if Owens consented to the search. The State argues that there was no evidence that Owens consented to the collection of the swabs here. Detective Rodgers initially testified that he did not "ask [Owens] for consent to search," Tr. Vol. II p. 53; however, he later testified that he "did ask [Owens] for a swab," *id*. at 56. Detective Rodgers did not mention whether Owens ultimately consented to law enforcement's collection of the swabs, and no further evidence was presented on this issue.

information" which law enforcement are permitted to collect from lawfully arrested persons. *Id.*

[23] The collection of the swabs here is essentially the same type of search as the collection of the buccal swab in *Garcia-Torres*. In fact, the swabs here are arguably less intrusive because they were collected from the surface of Owens' hands and clothing rather than from within his oral cavity. Moreover, the swabs here did not involve the type of "general search" of which *Pirtle* protections are principally concerned. *See M.D.*, 108 N.E.3d at 306. This was not a search of a home or vehicle but was instead a limited search of the blood on Owens' hands and clothing for the purpose of determining whether Blount's DNA was present on Owens. *Pirtle* advisements were not required before the swabs here were collected, and the trial court did not err by admitting the DNA evidence obtained therefrom.

[24] Moreover, even if *Pirtle* advisements were required here, any error in admitting the DNA evidence from the swabs of Owens' hands and clothing was harmless. Owens admitted during his interview with law enforcement that he fought Blount with a bottle and a knife because he believed she and her friends were "going after [his] family," and he wanted to "kill everybody who got involved with it." State's Ex. 32 at 22:50, 40:00. Blount identified Owens at the hospital and in court as her assailant, and she testified regarding the injuries he inflicted upon her. Additionally, the swabs of Owens' hand and clothing were not the only DNA evidence presented at trial; blood recovered from the crime scene also indicated the presence of Owens' DNA. Any error in the admission of the

DNA evidence from the swabs of Owens' hands and clothing was harmless. *See Torres v. State*, 673 N.E.2d 472, 474-75 (Ind. 1996) (holding that, although evidence should have been excluded due to law enforcement's failure to give *Pirtle* advisements prior to obtaining defendant's consent to search, error in the admission of the evidence was harmless based on witness testimony and DNA evidence).

## II. Sufficient evidence supports Owens' conviction.

[25] Owens next argues that insufficient evidence supports his conviction. We disagree. Sufficiency of evidence claims "warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility." *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020) (citing *Perry v. State*, 638 N.E.2d 1236, 1242 (Ind. 1994)). When there are conflicts in the evidence, the fact-finder must resolve them. *Young v. State*, 198 N.E.3d 1172, 1176 (Ind. 2022). We consider only the evidence supporting the judgment and any reasonable inferences drawn from that evidence. *Powell*, 151 N.E.3d at 262 (citing *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *cert. denied*). "We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt." *Id.* at 263. We affirm the conviction "'unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn

from it to support the verdict.'" *Sutton v. State*, 167 N.E.3d 800, 801 (Ind. Ct. App. 2021) (quoting *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007)).

[26]  Owens was convicted of attempted murder. A person who "knowingly or intentionally kills another human being . . . commits murder, a felony." Ind. Code § 35-42-1-1(1). As for attempted murder, Indiana's attempt statute provides, in relevant part:

> A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime. . . . [A]n attempt to commit murder is a Level 1 felony.

Ind. Code § 35-41-5-1(a). The State must prove that the defendant specifically intended to kill the victim in order for the defendant to be found guilty of attempted murder. *Rosales v. State*, 23 N.E.3d 8, 11-12 (Ind. 2015).

[27]  Owens argues that the State presented insufficient evidence to demonstrate that he acted with the specific intent to kill Blount. "[I]ntent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury." *Powell v. State*, 151 N.E.3d 256, 270-71 (Ind. 2020). Here, Owens struck Blount at least thirteen times in the head, including with a glass bottle. Using a small knife, he stabbed Blount's face, chest, and abdomen, causing Blount's colon to protrude through her skin. Before leaving the house, Owens "slit" Blount's throat with the knife. Tr. Vol. II p. 14. Although Blount

survived her injuries, she required intensive surgery and remained in the hospital for approximately seven days.

[28] Owens recognizes that intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury; however, Owens argues that this inference was "'rebutted.'" Appellant's Br. p. 15 (quoting *Shutt v. State*, 367 N.E.2d 1376, 1379 (Ind. 1977) ("[M]alice may be inferred from the intentional use of a deadly weapon in such a manner as is likely to cause death. . . . However, such inference may be rebutted.")).[5] Owens argues that, although he entered the house with the bottle and knife, he "did not attempt to obtain a more suitable instrument to inflict lethal force" and that Blount did not suffer "great bodily injury." *Id*. at 16. Blount's injuries and the horrible manner in which they were inflicted contradict Owens' argument. Sufficient evidence supports Owens' conviction.

## Conclusion

[29] The trial court did not err by admitting the challenged DNA evidence, and sufficient evidence supports Owens' conviction. Accordingly, we affirm.

[30] Affirmed.

---

[5] More recent cases from our Supreme Court discussing the inference to be drawn from the use of a deadly weapon no longer use this rebuttal language. *See, e.g.*, *Powell*, 151 N.E.3d at 270-71 ("[I]ntent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury."); *Schuler v. State*, 112 N.E.3d 180, 188 (Ind. 2018) ("Intent to kill may be inferred from the intentional use of a deadly weapon in a manner likely to cause death or great bodily injury.").

May, J., and DeBoer, J., concur.

ATTORNEYS FOR APPELLANT

Peyton M. Balasko
Kyle K. Dugger
Monroe County Public Defender Agency
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana